237 P.3d 853 (2010)
236 Or. App. 5
STATE of Oregon, Plaintiff-Respondent,
v.
Gary SMITH, aka Gary Smith, Jr., Defendant-Appellant.
070230679; A138276.
Court of Appeals of Oregon.
Argued and Submitted October 26, 2009.
Decided June 23, 2010.
*854 Rebecca A. Duncan, Assistant Chief Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.
Linda Wicks, Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Jerome Lidz, Solicitor General.
Before ROSENBLUM, Presiding Judge, and BREWER, Chief Judge, and DEITS, Senior Judge.
BREWER, C.J.
Defendant, who was convicted of possession of a controlled substance, ORS 475.840 asserts on appeal that the trial court erred in denying his motion to suppress evidence. The trial court's factual findings are binding on appeal if there is constitutionally sufficient evidence to support them. State v. Ehly, 317 Or. 66, 75, 854 P.2d 421 (1993). We therefore review the record, and all inferences that it will support, in the light most favorable to the trial court's findings. Id. In the absence of express findings, we presume that the trial court decided factual issues in a manner consistent with its ultimate conclusion. Ball v. Gladden, 250 Or. 485, 487, 443 P.2d 621 (1968). The following facts are either undisputed or are the trial court's findings and supported by constitutionally sufficient evidence. Ehly, 317 Or. at 75, 854 P.2d 421. As explained below, accepting the trial court's factual determinations, we nonetheless conclude that defendant was unlawfully stopped and, under Article I, section 9, of the Oregon Constitution was entitled to suppression of the evidence obtained as a result of that unlawful stop. Accordingly, we reverse and remand.
The relevant facts are not disputed. Defendant was a passenger in a car that was *855 stopped for making an improper signal before turning. Officer Manzella approached the car and determined that the driver's license had been suspended. Manzella also asked defendant for his name, which Manzella wrote down. Manzella determined that, pursuant to a police policy, the car needed to be towed. Manzella wrote out a citation, which he handed to Officer Hart, who approached the driver's side of the car. Manzella approached the passenger side of the car, asked defendant to step out of the car, and as defendant was stepping out, Manzella asked defendant, "Do you have anything on you you shouldn't have, do you have any weapons, anything like that?" Defendant told Manzella that he had a pipe and several rocks of crack cocaine in his possession. Manzella seized those items and arrested defendant for possession of a controlled substance. Although Manzella asked defendant to step out of the car because he intended to have it towed, he did not communicate that reason to defendant. Nor did Manzella communicate to defendant that he was, or was not, free to leave. The trial court found that defendant subjectively did not feel free to leave.
Defendant asserted before the trial court, and reiterates on appeal, that he was "seized" for purposes of Article I, section 9, at the point when he acknowledged having drugs in his possession. Article I, section 9, gives people the right "to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure." There are three general categories of encounters that we analyze for purposes of Article 1, section 9. First, there is "mere conversation," which involves a "noncoercive encounter" with a police officer that includes "no restraint of liberty." That type of encounter requires no justification and does not implicate Article I, section 9. State v. Holmes, 311 Or. 400, 410, 813 P.2d 28 (1991) ("[L]aw enforcement officers remain free to approach persons on the street or in public places, seek their cooperation or assistance, request or impart information, or question them without being called upon to articulate a certain level of suspicion in justification if a particular encounter proves fruitful."). Second, a temporary restraint of a person's liberty for the purpose of investigation must be justified by a reasonable suspicion of criminal activity. Id. at 407, 813 P.2d 28. Finally, an arrest is a seizure under Article I, section 9, that must be justified by probable cause. Id.
Because the state concedes that Manzella did not have reasonable suspicion or probable cause to believe that defendant had committed a crime when he asked him to step out of the car and inquired about whether defendant had anything that he should not have, the dispositive issue is whether Manzella engaged defendant in "mere conversation" by doing so, rather than having restrained or "seized" defendant in the constitutional sense.
In Holmes, the court distinguished between "mere conversation" and an encounter that constitutes a seizure under Article I, section 9. The court held that a person is seized for purposes of Article I, section 9,
"(a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) whenever an individual believes that (a), above, has occurred and such belief is objectively reasonable in the circumstances."
Holmes, 311 Or. at 409-10, 813 P.2d 28.
In applying the test from Holmes, the trial court struggled with the analysis, but felt compelled to reach the result that it did based on appellate case law. The court said:
"I mean if you're asking me do I think that somebody under those circumstances would be free to say no, I'm leaving, bye, actually, I don't think somebody would feel free to leave unless they happened to be trained as a lawyer and have a great deal of self confidence and willing to take the risk that the officer would understand the nuances in Salem. You're right, can't do a thing.
"But that's not how the appellate courts think. The way the appellate courts think is that the line between a mere conversation and a constitutional stop requires something that conveys the impression that you're not free to leave to a reasonable *856 person from the appellate point of view.
"And from the appellate point of view, it takes a warrant check or something that is the equivalent like sit here or stay there or don't move for a minute while Iwhile I makeyou just move over there and stand for a second.
"None of that happened here. So I don't see how I can grant the motion."
In sum, in the trial court's own view, a reasonable person would not have felt free to leave under the circumstances of this case. Further, the court found that defendant did not subjectively feel free to leave. The court nonetheless denied the motion to suppress, based on its understanding of appellate case law.
The case upon which the trial court primarily reliedand on which the state primarily relies on appealis State v. Amaya, 336 Or. 616, 89 P.3d 1163 (2004). In Amaya, the issue was whether an officer, during a valid traffic stop, "may question a person in the vehicle about safety matters unrelated to the purpose of the stop." Id. at 618, 89 P.3d 1163. The defendant was a passenger in a van that was lawfully stopped for an infraction. Reynolds, the officer who approached the van, observed that both the driver and the defendant appeared nervous, and the defendant appeared to be placing something in a large purse at her feet. Because of her actions, Reynolds felt concerned for his safety. Id. After discovering that the driver's license had been suspended, Reynolds inquired whether the defendant had a valid license and, when she responded that she did, took her license to check its validity. Id. at 618-19, 89 P.3d 1163.
When the driver consented to a search of the van, Reynolds asked the defendant and the driver to step out. Because of Reynolds's concern about the defendant's purse, he asked her to leave it in the van. Id. at 619, 89 P.3d 1163. Instead, she removed the bag from the van and tried to conceal it. Reynolds, believing that the defendant might have a weapon or drugs in the bag, asked the defendant what was in it. The defendant acknowledged that there was a gun in the bag and that she did not have a concealed weapon permit. Reynolds then searched the bag. Id.
In Amaya, the defendant argued "that the police officer's questions to her and his seizure of a weapon from her bag violated her right to be free from unreasonable searches and seizures[.]" Id. at 621-22, 89 P.3d 1163. The court first considered whether ORS 810.410 authorized the officer to ask the defendant about the contents of her bag; the court held that that inquiry was permissible under the statute because its purpose was "to ensure the safety of the officer." Id. at 625, 89 P.3d 1163. Turning to whether the question about the contents of the defendant's bag nonetheless violated Article I, section 9, the court noted:
"[The] defendant argues that (1) Reynolds's questions to her about the bag at least temporarily restrained her liberty and therefore constituted a `seizure' for purposes of Article I, section 9; and (2) because Reynolds did not have a reasonable suspicion that defendant posed a threat to his safety, the seizure violated Article I, section 9."
Id. at 625, 89 P.3d 1163. The defendant also posited, in the alternative, that she had been unconstitutionally seized at various earlier points in the encounter, including when she was asked to get out of the van. Id. at 627, 89 P.3d 1163. The court declined to address the defendant's argument as a separate question, because she had not preserved it, but determined that it "must be considered as part of her argument about the questioning concerning her bag." Id. at 630, 89 P.3d 1163.
The court then made the statements on which the state relies in the present case:
"It is a truism that all passengers in a validly stopped car have been `stopped,' at least physically. However, such a stop is not a `seizure' of those passengers for constitutional purposes. See Holmes, 311 Or. at 410-12 [813 P.2d 28] (discussing circumstances in which police-citizen encounters are not `seizures'). It also is true that an officer may take reasonable steps respecting the passengers, including, for example, asking the passengers to exit the vehicle so *857 the officer may search the vehicle, assuming that the driver has consented to the search or that it otherwise is justified. However, an officer's further exercise of coercive authority over the passengers after they are out of the vehicle may, in certain circumstances, constitute a seizure. Here, defendant argues that Reynolds's questions to her after she exited the van about the contents of her bag constituted such a seizure."
Id. at 630-31, 89 P.3d 1163. The court went on to conclude that it need not decide whether the defendant was seized by the questioning, given that any such seizure was justified by officer safety concerns. Id. at 631, 89 P.3d 1163.
The Supreme Court's holding in Amaya is not pertinent to any issue in this case; there is no suggestion that officer safety concerns justified what occurred here. To the extent that the state relies on the court's statement in passing that "an officer may take reasonable steps respecting the passengers, including, for example, asking the passengers to exit the vehicle so the officer may search the vehicle, assuming that the driver has consented to the search or that it otherwise is justified," id. at 630-31, 89 P.3d 1163, we do not read that statement to suggest that, regardless of the totality of the circumstances, an officer's request that a person step out of a vehicle inevitably constitutes "mere conversation." As noted above, the proper inquiry is whether, under the totality of the circumstances, the person believed that the officer intentionally and significantly interfered with his or her liberty or freedom of movement "and such belief [was] objectively reasonable in the circumstances." Holmes, 311 Or. at 409-10, 813 P.2d 28.
We regard the court's statement in Amaya as reflecting its view that, if a person who knows that the vehicle he or she occupies is about to be searched and is asked to step out of the vehicle in order to allow the search to proceed, merely asking the person to step out of the vehicle would not lead an objectively reasonable person to believe that he or she had been "seized."
But that is not what happened in this case. Here, Manzella initially approached defendant, asked for his name, and wrote it down. Manzella approached defendant a second time, asked him to step out of the car, and, while defendant was stepping out of the car, questioned him about anything he "shouldn't have." There is no suggestion that either officer at the scene had communicated with the driver or defendant that they were being asked to step out of the car to facilitate the towing of the car; in fact, the evidence indicates that the driver had not yet even been given the citation that Manzella had written. The "totality" of those circumstances differs significantly from a situation where a vehicle's occupant is asked to step out in order to allow the officer to do something with the vehicle that is legitimately related to the traffic stop, or was consented to by the driver.
To the extent that the state is relying on this court's decision in Amaya, see State v. Amaya, 176 Or.App. 35, 29 P.3d 1177 (2001), aff'd on other grounds, 336 Or. 616, 89 P.3d 1163 (2004), again we disagree that it dictates the result here, because the facts are distinguishable, as noted above, the legal issue addressed there was different, and our more recent case law sheds further light on the proper analysis. The argument made to this court by the defendant in Amaya was that any police inquiry during a traffic stop that was unrelated to the stop must be based on reasonable suspicion. Id. at 38-39, 29 P.3d 1177. The defendant did not urge, nor did this court decide, the significance of being asked to get out of a vehicle in making a determination, under the totality of the circumstances, of whether or not a passenger had been "seized" for purposes of Article I, section 9.
More on point is our recent decision in State v. Lantzsch, 229 Or.App. 505, 214 P.3d 22 (2009). In Lantzsch, the defendant was a passenger in a car that was lawfully stopped for an infraction. After an officer determined that the driver had a suspended license, he asked her to step out of the car and come to the police car. Id. at 507, 214 P.3d 22. The defendant, who remained seated in the car, turned around several times to look at the police car during the ensuing five minutes. Id. After the officer arrested the *858 driver and discovered drugs in a search incident to arrest, he returned to where the defendant remained seated in the car. Id.
"The deputy stood outside the car, with defendant still seated in the passenger's seat, and asked defendant to step out of the car and talk to him. The deputy did not tell defendant that he was free to go. The deputy testified that he did not order defendant to get out of the car but, rather, merely asked him to step out so they could talk. Defendant got out of the car and was asked to walk back to the rear of the car to meet the deputy. By this time, a second deputy had arrived to act as a cover officer and was standing behind the deputy who had first contacted defendant. As they reached the rear of the car, the deputy asked defendant whether he had any `weapons or contraband.'"
Id. at 507-08, 214 P.3d 22. One of the reasons why the deputy wanted to talk to the defendant was because he "wanted to figure out who [the driver] was." Id. at 509, 214 P.3d 22 (brackets in original). We stated:
"In this case, although the deputy testified that he approached defendant to ask him about the driver's identity as part of his investigation of the driver, the deputy did not ask defendant that question until after he had asked defendant to get out of the car, asked him whether he had any drugs or weapons, and obtained his consent to a search. The deputy's stated justification for approaching defendant is simply not relevant to our determination of whether the deputy seized defendant by asking him to get out of the car and then asking him about drugs and weapons. See State v. Ainsworth, 310 Or. 613, 621, 801 P.2d 749 (1990) ('Article I, section 9, prohibits certain governmental action, not certain governmental states of mind. The Oregon Constitution does not require an inquiry into the observing officer's thoughts to determine whether the officer's conduct unconstitutionally violates a defendant's Article I, section 9, rights.'); see also State v. Hall, 339 Or. 7, 29 n. 16, 115 P.3d 908 (2005) (same). Regardless of the deputy's assertion that he approached defendant as part of his investigation of the driveran investigation that had ended by that point in the encounterthe first contact the deputy had with defendant was his request that defendant get out and come to the rear of the car and speak with him; moreover, that request was immediately followed by an inquiry into drugs and weapons."
Lantzsch, 229 Or.App. at 512-13, 214 P.3d 22 (emphasis in original). Ultimately, we determined that an objectively reasonable person in the defendant's position could have believed that the officer had significantly restricted his liberty or freedom of movement:
"We conclude for the following reasons that, in the totality of the circumstances in this case, a reasonable person in defendant's position could have believed that the deputy had exercised authority over his freedom of movement when the deputy asked defendant to get out of his vehicle; that was an exercise of authority that implicated his rights under Article I, section 9, and, accordingly, must have been based on a reasonable suspicion that he had committed or was about to commit criminal conduct. Hall, 339 Or. at 15, [115 P.3d 908]. * * *
"At the time the deputy asked defendant to get out of the car, a second deputy had arrived and was standing `a few feet' behind the deputy; defendant was asked not only to get out of the car, but also to walk to the rear of the car to speak with the deputy. According to the deputy's testimony, he did not tell defendant that he was free to go, and there is no evidence in the record showing that the deputy made defendant aware that he was being approached simply as part of the deputy's investigation of the driver. Indeed, the deputy said nothing to defendant to indicate that he himself was not the target of a criminal investigation. Thus, if defendant believed that he was not free to leave when the deputy asked him to get out the car, that belief was reasonable."
Lantzsch, 229 Or.App. at 515-16, 214 P.3d 22.
The present case is similar in several respects. First, as we noted in Lantzsch, an officer's unexpressed reasons for approaching and questioning someone are "simply not *859 relevant" when the question is whether a reasonable person in the defendant's position could have believed that an officer had significantly restricted his or her liberty or freedom of movement. Id. at 513, 214 P.3d 22 (citing Ainsworth, 310 Or. at 621, 801 P.2d 749). Thus, although in the present case, it appears that Manzella had a valid reason related to the traffic stop for asking defendant to step out of the car (because Manzella intended to have it towed), that reason was not expressed to defendant or the driver at the time defendant was asked to step out, and therefore, on this record, does not inform what a reasonable person in defendant's situation would have thought.
Second, in this case, as in Lantzsch, there was a second officer on the scene. Third, as in Lantzsch, defendant was not told he was free to leave. Finally, as in Lantzsch, the officer immediately questioned defendant about contraband, rather than pursuing further inquiry or taking further action related to the traffic stop. The factual difference that defendant here was questioned about contraband immediately upon stepping out of the car, whereas the defendant in Lantzsch was asked to step to the back of the car first is a minor distinction, at best, that has little bearing on whether a reasonable person in defendant's position could feel that his liberty had been significantly restricted. We thus conclude, as we did in Lantzsch, that the "objective" inquiry under the Holmes formulation leads to the conclusion that a person in defendant's position could have believed that his liberty and freedom of movement had been restricted and that that belief was objectively reasonable under the circumstances.
In Lantzsch, we were obliged to remand the case because the trial court had not made the requisite factual finding concerning the subjective prong of the Holmes test. Lantzsch, 229 Or.App. at 516-17, 214 P.3d 22. Here, by contrast, the trial court specifically found that defendant subjectively believed that his liberty and freedom of movement had been restricted. Given our conclusion that defendant's subjective belief was objectively reasonable, we conclude that the trial court erred in denying defendant's motion to suppress.[1]
We emphasize that our inquiry is into the totality of the circumstances that surrounded defendant's encounter with the police. There is no bright-line rule as to whether an officer's request that a person step out of a vehicle in the context of a traffic stop constitutes a seizure for purposes of Article I, section 9. Such a request is merely one of the factors that is part of the totality of the circumstances that must be evaluated.
Reversed and remanded.
NOTES
[1] The state appears to take the position that, although defendant argued in the trial court that he was entitled to suppression, defendant's failure to make an argument pursuant to State v. Hall, 339 Or. 7, 115 P.3d 908 (2005), that there was no attenuation between the illegality and the evidence he sought to suppress, precludes suppression. The state is incorrect. "After a defendant shows a minimal factual nexus between unlawful police conduct and the defendant's consent, then the state has the burden to prove that the defendant's consent was independent of, or only tenuously related to, the unlawful police conduct." Id. at 34-35, 115 P.3d 908 (emphasis added). The state makes no argument that it has demonstrated attenuation here.